IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) |
| Plaintiff, | ) |
| | ) |
| MICHAEL D. WORMACK; DONALD H. FRENCH; DEREK K. FRENCH, | ) Civil Action No. 04-1460 |
| Plaintiffs-Intervenors, | ) |
| | ) |
| vs | ) |
| | ) |
| WILLIAMHOUSE OF PENNSYLVANIA, LLC, a wholly owned subsidiary of WILLIAMHOUSE, LLC, | ) |
| Defendant. | ) |

REPORT AND RECOMMENDATION

I. Recommendation:

It is respectfully recommended that the defendant's motion for summary judgment (Docket No. 15) be granted as to all claims which are said to have occurred prior to November 1, 2000 and as to the Title VII claims asserted against it which are said to have occurred prior to September 12, 2002 and denied in all other respects, and that its alternate motion for partial summary judgment on plaintiff-intervenor Michael Wormack's claims for damages for the period following his September 24, 2004 voluntary resignation of employment with it (Docket No. 15) be granted.

II. Report:

Presently before the Court is a motion for summary judgment submitted by the defendant, Williamhouse of Pennsylvania, LLC, a wholly owned subsidiary of Williamhouse, LLC ("Williamhouse").[1]  In the event summary judgment is improper, Williamhouse has filed an

---

1.   Since the filing of this action, Williamhouse changed its name to reflect the name of its corporate parent, National Envelope Corporation.  However, since previous pleadings refer to the defendant as Williamhouse, this Report and Recommendation will continue to refer to it as such.

alternate motion for partial summary judgment on Michael Wormack's claims for damages for the period following his voluntary resignation of employment with it on September 24, 2004.

The plaintiff, Equal Employment Opportunity Commission ("EEOC"), and plaintiff-intervenors Michael D. Wormack, Donald H. French, and Derek K. French, have filed race discrimination complaints against Williamhouse, alleging that it failed to sufficiently compensate Wormack, French and French because of their race, which is African American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.  The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345.[2]

The EEOC complains that since at least November 2000, Williamhouse has engaged in unlawful employment practices in violation of Title VII by compensating Michael Wormack and Derrick French at significantly lower rates of pay than their white counterparts who performed similar functions, and by not sufficiently compensating Donald French because of his race.  Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).

Relevant facts, to which there is no dispute, are these: on November 1, 2000, Michael Wormack, Donald French and Derrick French began their employment with Williamhouse, which is engaged in the manufacturing of envelopes and related products.  Prior to working for Williamhouse, the plaintiff-intervenors worked for American Pad and Paper ("AMPAD").  On November 1, 2000, Williamhouse's corporate parent, National Envelope

---

2.   The EEOC filed its complaint against Williamhouse on behalf of Michael Wormack, Donald French and Derek French on September 22, 2004.  On October 21, 2004, Wormack, French and French moved to intervene in this action pursuant to 42 U.S.C. § 2000e-5(f)(1), and by Order dated November 1, 2004, the Court granted their motion to intervene.  The plaintiff-intervenors then filed their complaint against Williamhouse on November 5, 2004.

Corporation ("NEC"), acquired all the assets of AMPAD pursuant to an Order of the United States Bankruptcy Court for the District of Delaware.  Included in the assets acquired by NEC was an envelope manufacturing facility located in Scottdale, PA, where the plaintiff-intervenors were employed.

On November 1, 2000, Williamhouse hired the plaintiff-intervenors as new employees, as well as other personnel working at the Scottdale, PA facility.  Upon hiring the plaintiff-intervenors, Williamhouse maintained their same level of salary and benefits as they had received from AMPAD.

For instance, with respect to Michael Wormack, the record shows that immediately prior to November 1, 2000, Mr. Wormack was employed by AMPAD as a shift supervisor, where he was earning an annual salary of $32,000.  On November 1, 2000, upon NEC's acquisition of AMPAD's assets, Wormack was hired as a shift supervisor for Williamhouse at an annual salary of $32,000.  Wormack worked as a shift supervisor in the Scottdale facility until his voluntary resignation on September 24, 2004.  During his employment with Williamhouse, Mr. Wormack never held a position which ranked higher than shift supervisor.  At the time of his voluntary resignation, Mr. Wormack had already secured new employment in California, where he was paid a higher salary than he earned with Williamhouse.

With respect to Derek French, the record shows that immediately prior to November 1, 2000, Mr. French was employed by AMPAD as a shift supervisor, where he was earning an annual salary of $32,000.  On November 1, 2000, Derek French was hired as a shift supervisor for Williamhouse at an annual salary of $32,000.  Currently, Derek French remains employed with Williamhouse as a shift supervisor at its Scottdale facility, having never held a higher-ranking position during his employment with it.

As to Donald French, the record shows that in 1998, while he was employed by AMPAD, Donald French was promoted from shift supervisor to assistant plant superintendent at the Scottdale facility, where he had supervisory responsibility over other supervisors.  In 1999,

3

Donald French returned to the position of shift supervisor at his own request, but his pay was not reduced. Thus, immediately prior to November 1, 2000, Donald French was employed by AMPAD as a shift supervisor, where he was earning an annual salary of $46,592. On November 1, 2000, Mr. French was hired as a shift supervisor for Williamhouse at an annual salary of $46,592. Currently, Donald French remains employed with Williamhouse as a shift supervisor.

In the complaints against Williamhouse, it is alleged that Michael Wormack worked for the defendant or its predecessor since October 1993 and earned approximately $35,708 per year during his employment with it; that Derrick French has worked for the defendant or its predecessor since October 1986 and earns about $34,541.24 per year; that comparable non-African American shift supervisors have earned substantially greater salaries than Michael Wormack and Derrick French; and that Mr. Wormack complained to Williamhouse about the disparity in wages of its shift supervisors, but the defendant failed to equalize their pay.

As to Donald French, the complainants aver that he has worked for the defendant or its predecessor since 1965 and earns approximately $48,425 per year; that he has more seniority and supervisory experience than any employee in the defendant's facility; but that it has discriminated against Donald French on the basis of his race in regard to his pay, as it pays non-African American supervisors with less seniority and tenure almost the same salary it pays Mr. French, and he has received lower annual salary increases than its white supervisors.

In addition to claiming the defendant violated Title VII, the plaintiff-intervenors assert that by virtue of its complained-of acts, Williamhouse deprived them of the right to make and enforce contracts on the same basis as enjoyed by white citizens in violation of 42 U.S.C. § 1981.[3] Williamhouse is said to have acted with malice or reckless indifference to the federally

---

3.    In pertinent part, 42 U.S.C. § 1981(a) provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens..." Under the statute, "the term 'make and enforce contracts' includes the making, performance, modification,

(continued...)

protected rights of the plaintiff-intervenors.  Thus, the complainants seek equitable and monetary
relief, including a permanent injunction to enjoin the defendant from discriminating against its
employees on the basis of race, compensation to the plaintiff-intervenors for past and future
pecuniary losses, compensatory and punitive damages, reasonable attorneys fees and costs.

      Williamhouse has moved for summary judgment on all claims asserted against it.
Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the
movant is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c); Biener v. Calio, 361 F.3d
206, 210 (3d Cir. 2004).

      Williamhouse first argues that summary judgment should be granted in its favor
on all claims which occurred prior to November 1, 2000, because NEC did not assume
AMPAD's liabilities when it purchased it out of bankruptcy on that date.  We agree.

      The Third Circuit Court of Appeals has stated that "absent a contractual obligation
to do so, a successor corporation does not [ordinarily] assume the liabilities of its predecessor."
Rego v. ARC Water Treatment Co. of PA, 181 F.3d 396, 401 (3d Cir. 1999).  However, "in
employment discrimination cases, the doctrine of successor liability applies where the assets of
the defendant employer are transferred to another entity."  Brzozowski v. Correctional Physician
Services, 360 F.3d 173, 177 (3d Cir. 2004), citing Rego, 181 F.3d at 401.  In Brzozowski and
Rego, the Court set forth several factors to be considered in determining if successor liability lies
in a case of employment discrimination; Brzozowski, 360 F.3d at 178, and Rego, 181 F.3d at
402; and the complainants rely on these cases to argue that successor liability is applicable here.

      Significantly however, this case differs from Brzozowski and Rego, in that
Williamhouse purchased AMPAD's assets out of bankruptcy, subject to an Order of the United
States Bankruptcy Court for the District of Delaware and an Asset Purchase Agreement
authorized and approved by the Bankruptcy Court, which specify that Williamhouse is not

---

3.   (...continued)
and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions
of the contractual relationship."  42 U.S.C. § 1981(b).

subject to successor liability by reason of its acquiring AMPAD's assets.[4]   Thus, the issue of

successor liability in this case is governed by In Re Trans World Airlines, Inc., 322 F.3d 283 (3d

Cir. 2003), where our Court of Appeals affirmed an Order of the United States Bankruptcy Court

for the District of Delaware which authorized the sale of assets of Trans World Airlines to

American Airlines "free and clear" of successor liability.  In so ruling, the Court in In Re Trans

World Airlines reviewed the Bankruptcy Court's Sale Order and noted that it "extinguished

successor liability" on the part of American Airlines for any discrimination charges pending

before the EEOC.  Id. at 286-287.

Similarly here, the Order of the United States Bankruptcy Court approving the

sale of AMPAD's assets to Williamhouse provides in pertinent part:

> ... [A]ll persons and entities holding Liens or Claims of any
> kind and nature against any of the Debtors or with respect
> to the Assets ... relating to the Debtors, the operation of the
> Debtors' businesses prior to the Closing or the Assets, are
> hereby barred, estopped and permanently enjoined from
> asserting such Liens and Claims against the Assets or the
> Buyer, its successors, designees or assigns, or their respective
> affiliates, shareholders, members, officers, directors or trustees.[5]

> ... [T]he transfer of the Assets and the assignment of the
> Assumed Contracts do not and will not subject the Buyer
> to any liability for claims against any Seller or the Assets,
> including, but not limited to, claims for successor or vicarious
> liability, by reason of such transfer... The Buyer shall not be
> deemed, as a result of any action taken in connection with the
> Asset Purchase Agreement, to: ... be the successor of any of
> the Debtors; ... or be responsible for any liability of any of
> the Debtors...[6]

Thus, by virtue of the aforesaid Order of the Bankruptcy Court, it appears that

---

4.   See, affidavit of Nathan F. Moser at ¶¶ 3-4 and Exhibits 1 and 2 attached thereto.

5.   Id. at Exhibit 1, ¶ 6.

6.   Id. at Exhibit 1, ¶ 17.  In his affidavit, Nathan F. Moser, President and CEO of NEC, avers that prior to November 1, 2000, AMPAD never received any complaints about wages, and that Williamhouse never received any complaints about supervisory wages until 2003, when Mr. Wormack first raised the issue.  See, affidavit of Nathan F. Moser at ¶¶ 9-10.

Williamhouse is not subject to any liability of its predecessor.  Hence, it is entitled to summary judgment on all claims which are said to have occurred prior to November 1, 2000.

Williamhouse also insists that summary judgment should be granted in its favor on all Title VII claims which occurred prior to September 12, 2002, arguing that such claims are time-barred, as they did not occur within 300 days of the date when Michael Wormack filed his charge of discrimination with the EEOC, which was July 8, 2003.  We agree.

In Title VII cases as here, where a charge of employment discrimination is filed with both the EEOC and a parallel state agency (i.e., the Pennsylvania Human Relations Commission), the charge must be filed within 300 days from the date of the alleged unlawful employment practice.  Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 469 (3d Cir. 2001).  "Absent a continuing violation, all discriminatory acts that are alleged to have occurred more than 300 days prior to the EEOC filing are time-barred."  Verdin v. Weeks Marine, Inc., 124 Fed. Appx. 92, 95 (3d Cir. 2005), citing National RR Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

The record shows that Michael Wormack filed a charge of discrimination with the EEOC on July 8, 2003.[7]  In Mr. Wormack's charge of discrimination, which was cross-filed with the Pennsylvania Human Relations Commission, he asserted a claim of race discrimination and a "continuing violation" of discrimination.[8]

Nonetheless, in Morgan, supra, the United States Supreme Court limited the applicability of the continuing violation doctrine, holding that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  536 U.S. at 113.  That is because "[e]ach discrete discriminatory act starts a new clock for filing

---

7.    See, Michael Wormack's EEOC charge (which is attached as Exhibit 2 to the affidavit of Mary Nowak).  Derek French and Donald French did not file charges of discrimination against Williamhouse.  See, defendant's statement of material facts at ¶ 65.

8.    See, Michael Wormack's charge of discrimination.

charges alleging that act."  Id.

In Morgan, the Court explained: "Discrete acts such as termination, failure to promote, denial of transfer or refusal to hire are easy to identify.  Each [such] incident of discrimination ... constitutes a separate actionable 'unlawful employment practice'".  Id. at 114. Although Morgan did not expressly state that an employee's receipt of a discriminatory wage payment constituted a discrete act, the Court cited the case of Bazemore v. Friday, 478 U.S. 385 (1986) for that proposition, stating: "when considering a discriminatory salary structure, the Court [in Bazemore] noted that although the salary discrimination began prior to the date that the act was actionable under Title VII, '[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII.'".  Morgan, 536 U.S. at 112, citing Bazemore, 478 U.S. at 395.

Following Morgan, Circuit Courts of Appeal hold that discriminatory pay practices constitute discrete acts of discrimination, and that an employee's recovery is limited to discriminatory paychecks received within the limitations period.  See, Ledbetter v. Goodyear Tire and Rubber Co., 421 F.3d 1169, 1180 (11th Cir. 2005) ("Under Morgan..., Ledbetter can state a timely cause of action for disparate pay only to the extent that the 'discrete acts of discrimination' of which she complains occurred within the limitation period"); Shea v. Rice, 409 F.3d 448, 451 (D.C.Cir. 2005) ("Morgan dooms any hope Shea entertained that his current (and allegedly discriminatory) paychecks can resurrect his otherwise untimely challenges to the paychecks he received"); Hildebrandt v. Illinois Dept. of Natural Resources, 347 F.3d 1014, 1028 (7th Cir. 2003) ("Using Morgan as our guide... we must conclude that each of Dr. Hildebrandt's paychecks that included discriminatory pay was a discrete discriminatory act, not subject to the continuing violation doctrine"); accord Forsyth v. Federation Employment & Guidance Serv., 409 F.3d 565, 573 (2d Cir. 2005).[9]  Since the complainants cannot establish a continuing

---

9.    In a pre-Morgan case, the Third Circuit Court of Appeals stated that "discriminatory wage
                                                                              (continued...)

violation of disparate pay, their Title VII claims which occurred prior to September 12, 2002 are time-barred.

Williamhouse also argues that since the plaintiff-intervenors filed their complaint in intervention on November 5, 2004, their claims under 42 U.S.C. § 1981 which are said to have occurred prior to November 5, 2002 are time-barred by the applicable two-year statute of limitations.  In support of its argument, Williamhouse cites Goodman v. Lukens Steel Co., 482 U.S. 656, 600 (1987), for the proposition that the appropriate limitations period for claims arising under § 1981 is the relevant state statute of limitations for personal injury claims.  Since the plaintiff-intervenors were employed in Pennsylvania during the time they complain of receiving disparate pay, Williamhouse insists the Pennsylvania limitations period for personal injury claims -- which is two years -- controls.  See, 42 Pa.C.S.A. § 5524.  We disagree.

In Jones v. R.R. Donnelley & Sons, Inc., 541 U.S. 369, 371 (2004), the United States Supreme Court stated: "[t]hree years after our decision in Goodman [v. Lukens Steel Co.], Congress enacted a catchall 4-year statute of limitations for actions arising under federal statutes enacted after December 1, 1990,  28 U.S.C. § 1658."  In 28 U.S.C. § 1658(a), it is provided:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of enactment of this section may not be commenced later than 4 years after the cause of action accrues.

The Court in R.R. Donnelley & Sons explained: "Section 1658 was enacted on December 1, 1990.  Thus, [a complainant's] claims are subject to the 4-year statute of limitations if they arose under an Act of Congress enacted after that date."  541 U.S. at 372.

The original version of 42 U.S.C. § 1981 was enacted as § 1 of the Civil Rights Act of 1866.  Id.  As originally enacted, § 1981 provided in relevant part that "all persons [within

_____

9.   (...continued)
payments constitute a continuing violation".  Cardenas v. Massey, 269 F.3d 251, 257 (3d Cir. 2001).  Clearly however, Morgan has foreclosed use of the continuing violation doctrine for discrete acts of discrimination.

the jurisdiction of the United States] shall have the same right in every State and Territory to make and enforce contracts... as is enjoyed by white citizens." Id.  In interpreting the original version of § 1981, the Supreme Court held that the statutory right to "make and enforce contracts" only provided a remedy for discriminatory conduct that occurred at the initial formation of the contract, Patterson v. McLean Credit Union, 491 U.S. 164, 179 (1989), such that discriminatory acts pertaining to the terms and conditions of employment occurring after the formation of the employment contract were not actionable.  Id. at 179-80.

In response to Patterson, Congress, in 1991, added a new subsection to § 1981 -- subsection (b) -- that defines the term "make and enforce contracts" to include the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." R.R. Donnelley & Sons, 541 U.S. at 372, citing 42 U.S.C. § 1981(b).  Certainly, the 1991 amendment to the statute "enlarged the category of conduct that is subject to § 1981 liability". Id. at 383 (citation omitted).  In light of the ruling in R.R. Donnelley & Sons, Courts hold that claims of discrimination which relate to the privileges, terms and conditions of employment arising after the formation of the employment relationship are governed by § 1658's four-year statute of limitations, whereas claims of discrimination actionable under the original version of § 1981 are governed by the relevant state law statutory period.  See, Jones v. GPU, Inc., 2005 WL 2108700, *5 (E.D.Pa., Sept. 1, 2005), and Chugh v. Western Inventory Services, Inc., 333 F.Supp.2d 285, 294-95 (D.N.J. 2004), citing R.R. Donnelley & Sons.  Here, the plaintiff-intervenors' § 1981 claims pertain to the terms and conditions of their employment with Williamhouse after the formation of their contractual relationship[10]; since these claims were made possible by the 1991 amendment to § 1981, they are governed by the four year limitations period set forth in 28 U.S.C. § 1658.  See, R.R. Donnelley & Sons, 541 U.S. at 383.

Williamhouse next argues it is entitled to summary judgment, because the

---

10.   See, EEOC's complaint at ¶ 7 and plaintiff-intervenors' complaint at ¶¶ 8 and 12.

complainants cannot show that it unlawfully compensated Wormack, French and French on the basis of their race.  As discussed below, material issues of fact are in dispute on this question, precluding summary judgment.

In cases alleging employment discrimination, a plaintiff can establish his claim either by the presentation of direct evidence of discrimination, or from indirect evidence which creates an inference of unlawful discrimination.  Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999).  A plaintiff attempting to establish direct evidence of discrimination "faces a high hurdle".  Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998).  "[T]he direct evidence must be so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production."  Id.

Here, the complainants have not established direct evidence of discrimination. Thus, their claims of race-based discrimination under Title VII and 42 U.S.C. § 1981 will be analyzed under the burden-shifting analysis articulated in McDonnell Douglas v. Green, 411 U.S. 792 (1973) and Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248 (1981) for cases involving indirect evidence.[11]

Under this framework, the complainants have the initial burden of establishing a prima facie case of discrimination.  See, Burdine, 450 U.S. at 252-53.  To establish a prima facie claim of discriminatory pay, the complainants must demonstrate that the plaintiff-intervenors were "performing work substantially equal to that of white employees who were compensated at higher rates" than they were paid.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1087 (3d Cir. 1996); accord, Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000).

Here, the complainants have established a prima facie claim of wage discrimination.  It is not disputed that supervisors Michael Wormack, Donald French and Derek

---

11.    The three-stage shifting burden of proof originally developed for cases arising under Title VII also applies to claims of race discrimination under 42 U.S.C. § 1981.  Stewart v. Rutgers, The State University, 120 F.3d 426, 432 (3d Cir. 1997).

French were performing work substantially equal to that of white supervisors at Williamhouse. Nonetheless, the defendant paid them less money than it paid certain white supervisors.  For instance, Donald French had the most seniority and supervisory experience of any employee in the defendant's Scottdale facility, yet in November 2000, Williamhouse paid Donald French $46,592, while it paid white supervisors James Kirchoff $58,101, Bill Neubert $51,047, and Sam Lilliock $48,377.[12]   Further, in December 1998, Michael Wormack and Derek French were promoted to supervisors, as was white employee Kathy DeMarco; yet in November 2000, Williamhouse paid Michael Wormack and Derek French $32,000 each, while it paid Kathy DeMarco $32,549.[13]   Evidence also shows that the plaintiff-intervenors received lower salary increases than numerous white supervisors employed by the defendant.[14]

In turn, Williamhouse has sustained its burden of production by presenting legitimate, non-discriminatory reasons for compensating the plaintiff-intervenors as it did.  See, St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2747 (1993).  Specifically, Williamhouse asserts as follows: that on November 1, 2000, upon hiring the plaintiff-intervenors, it set their salaries at the same rate as they were earning with AMPAD and employed them in their same jobs; that the only compensation-related acts it took as to Wormack, French and French were to grant them annual performance-based raises; and that the annual raises it granted them were not based on race, as evidenced by these facts: in 2001 and 2002, Mr. Wormack received the highest non-promotion based raises of any supervisor in the Scottdale facility, in 2004, both Wormack and Derek French received among the highest raises of any supervisor, and from 2001-2004, African American supervisors received greater percentage raises, on average, than did white

---

12.   See, plaintiff-intervenors' statement of material facts at ¶¶ 8-16.

13.   Id. at ¶¶ 24-25.

14.   See, EEOC's brief opposing the defendant's present motion at pp. 10-11.

supervisors.[15]   According to Williamhouse, since November 1, 2000, it has determined the

annual salary increases for its employees based solely on its evaluation of their performance,

without regard to their race or seniority with the company.[16]

      At this juncture, it is incumbent upon the complainants to satisfy their ultimate

burden of persuasion by producing evidence that the defendant's proffered reason for its

compensation-related acts was a pretext for discrimination.  See, St. Mary's Honor Center, supra,

113 S.Ct. at 2747-48.  The complainants may meet this burden in one of two ways: by

introducing evidence from which a factfinder could reasonably either

> (1) disbelieve the employer's articulated legitimate
> reasons; or (2) believe that an invidious discriminatory
> reason was more likely than not a motivating or
> determinative cause of the employer's action.

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

      To establish pretext under the first prong of the Fuentes standard, the Third

Circuit Court of Appeals has stated: "the plaintiff cannot simply show that the employer's

decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory

animus motivated the employer, not whether the employer is wise, shrewd, prudent or

competent."  Jones v. School Dist. of Philadelphia, 198 F.3d 403, 413 (3d Cir. 1999).  Rather,

the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable

factfinder could rationally find them unworthy of credence."  Id.  "[A] plaintiff may satisfy this

standard by demonstrating, through admissible evidence, that the employer's articulated reason

was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's

real reason.'"  Id.

      To survive summary judgment under the second prong of the Fuentes standard, a

---

15.    See, defendant's statement of material facts at ¶¶ 50-51.

16.    Id. at ¶¶ 32-36, 47-52, 59-60.

plaintiff may show pretext by "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Jones, 198 F.3d at 413. "For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff-intervenors], that the employer has previously discriminated against other persons within the [plaintiff-intervenors'] protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Id., quoting Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998).

Here, the complainants have proffered evidence of pretext.  First, they point to inconsistencies in Williamhouse's purported reasons for disparities in pay.  For instance, in response to Mr. Wormack's charge of race discrimination, Williamhouse told the EEOC in September 2003 that some of its white supervisors were paid more than Wormack because of their seniority.[17]  Likewise, when Wormack met separately with Ed Malone, the defendant's Plant Superintendent, and Jerry Fiano, the defendant's General Manager, to discuss his belief that African American supervisors were paid less than white supervisors, both Malone and Fiano told him he was paid less due to his lack of seniority.[18]

In discovery, however, the defendant retreated from its position that seniority attributed to Mr. Womack's pay differential.  Christopher Koontz, the defendant's Plant Manager, testified that salary increases at Williamhouse were based on performance, and that seniority plays no role in a salary increase.[19]  Likewise, in responding to the EEOC's first set of interrogatories, the defendant asserted: the "[i]nitial wage was set based on the wage with the

---

17.   See, plaintiff-intervenors' statement of material facts at ¶ 44.

18.   See, affidavit of Michael Wormack at ¶¶ 3-4 (at Exhibit 12 to plaintiff-intervenors' appendix).

19.   See, deposition of Christopher Koontz at p. 178 (at Exhibit 8 to plaintiff-intervenors' appendix).

prior employer and adjusted in subsequent years based on performance and economics."[20]   The Third Circuit Court of Appeals has stated: "If a plaintiff demonstrates that the reasons given for [an unlawful employment practice] did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext".   Abramson v. William Patterson College of New Jersey., 260 F.3d 265, 284 (3d Cir. 2001).

As further evidence of pretext, the complainants aver that Williamhouse retaliated against Michael Wormack after he complained of disparate wages by refusing to raise his salary. The record shows that in April 2003, Mr. Wormack told Christopher Koontz, the defendant's Plant Manager, that his salary was not comparable to other supervisors in his area, and he believed he was paid less than his counterparts because of his race; that Koontz related Mr. Wormack's comments about disparate pay to General Manager Jerry Fiano and Plant Supervisor Ed Malone; that on September 20, 2004, Fiano met with Wormack, who said he had received another job offer, and asked if Williamhouse could raise his salary to the level of higher-paid supervisors in his department; and that Fiano informed Wormack that in light of his pending EEOC charge against Williamhouse, he was unlikely to receive a salary increase.[21]   Clearly, an employer's reaction to its employee's legitimate civil rights activities is relevant to a showing of pretext.   McDonnell Douglas, supra, 411 U.S. at 804.

The complainants also argue that Williamhouse attempted to mislead the EEOC during its investigation of Mr. Wormack's charge by asserting that in 2003, none of its white plant supervisors received a salary increase, yet Mr. Wormack received a 2% increase.[22]   As the

---

20.   See, defendant's answers to EEOC's first set of interrogatories No. 3 (at Exhibit 6 to plaintiff-intervenors' appendix).

21.   See, plaintiff-intervenors' statement of material facts at ¶¶ 52-54, 58, 69 and Exhibit 10 to their appendix.

22.   See, plaintiff-intervenors' statement of material facts at ¶ 48.

complainants later learned, however, the reason why no white plant supervisors at Williamhouse received a salary increase in 2003 was because the defendant imposed a wage freeze on supervisors who were paid more than $40,000 (an amount not paid to Mr. Wormack).[23]  In addition, Williamhouse informed the EEOC during its investigation that Wormack received the greatest percentage increase in salary of all its supervisors in 2001, 2002 and 2003; but that was not true, as Elaine Mumau, a white supervisor, received a 3% increase in 2003, whereas Mr. Wormack received a 2% increase.[24]  According to the complainants, to the extent the aforesaid facts indicate that Williamhouse attempted to mislead the EEOC during its investigation, it is evidence of mendacity and indicative of pretext.

Based on the foregoing, genuine issues of material fact are in dispute as to whether the defendant unlawfully compensated the plaintiff-intervenors on the basis of their race. Thus, the defendant's motion for summary judgment should be granted as to all claims which are said to have occurred prior to November 1, 2000 and as to the Title VII claims asserted against it which occurred prior to September 12, 2002 and denied in all other respects.

In the alternative, Williamhouse moves for partial summary judgment on Michael Wormack's claims for damages for the period following his September 24, 2004 voluntary resignation of employment with it.  The record shows that Wormack voluntarily resigned his position with Williamhouse on September 24, 2004.[25]  At the time he resigned, Wormack had already secured new employment in California at a higher salary than he was earning at Williamhouse.[26]  Williamhouse argues that absent evidence Wormack suffered financial harm beyond the date of his resignation, he is not entitled to damages for lost wages after September

---

23.   Id. at ¶ 49.

24.   Id. at ¶¶ 50-51.

25.   See, defendant's statement of material facts at ¶ 8.

26.   Id. at ¶ 9.

24, 2004.  See, <u>Binker v. Com. of PA.</u>, 977 F.2d 738, 748-49 (3d Cir. 1992) (stating: "It is not uncommon for a court to award a disgruntled employee only the amount the individual was not in good faith able to recover through alternative employment"); and <u>Blum v. Witco Chem. Corp.</u>, 829 F.2d 367, 374 (3d Cir. 1987) (since a plaintiff has a duty to mitigate damages, "his new salary will be deducted from the old to avoid a windfall award").

The EEOC argues that the defendant's alternate motion is inappropriate, because in Mr. Wormack's resignation letter dated September 24, 2004, he stated he was resigning because he and other African American workers at Williamhouse continue to be discriminated against, which has caused him emotional pain.  According to the EEOC, since race discrimination and retaliatory misconduct were factors compelling Mr. Wormack's resignation, summary judgment on the issue of damages is not appropriate.

Under Title VII, back pay awards are permissible when an employee does not leave his employment voluntarily, but rather is constructively discharged by his employer. <u>Durham Life Ins. Co. v. Evans</u>, 166 F.3d 139, 155 (3d Cir. 1999). "Constructive discharge exists if the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." <u>Id.</u> Here, the complainants have never pled and do not argue that Mr. Wormack was constructively discharged.

In <u>Durham Life Ins.</u>, <u>supra</u>, a case of sex discrimination involving a constructive discharge, the Third Circuit Court of Appeals stated: "Ordinarily, there is no entitlement to back pay when the claimant makes more money at another job than [he] could have made at [his] former job." 166 F.3d at 156.  Here, it is undisputed that Mr. Wormack voluntarily resigned his position at Williamhouse on September 24, 2004, at which time he had already secured new employment at a higher salary.  Further, the complainants have submitted no evidence showing that Wormack suffered financial harm beyond the date of his voluntary resignation due to the defendant's actions.  Thus, it appears that the defendant's alternate motion for partial summary

judgment should be granted.

Therefore, it is recommended that the defendant's motion for summary judgment be granted as to all claims which are said to have occurred prior to November 1, 2000 and as to the Title VII claims asserted against it which are said to have occurred prior to September 12, 2002 and denied in all other respects, and that its alternate motion for partial summary judgment on Michael Wormack's claims for damages for the period following his September 24, 2004 voluntary resignation of employment with it be granted.

Within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


s/ROBERT C. MITCHELL
_____
United States Magistrate Judge

Dated: December 1, 2005